SARAH ALDERMAN and SARAH ALDERMAN, Admr'x. of John H. Martin, deceased, plaintiff in error, vs. WILLIAM CHESTER, defendant in error.

M. died intestate, leaving an estate of lands, negroes, and other personal property—no debts—his wife N., and his son M., and daughter A., all of age, his only heirs at law. There was no administration. The three heirs got together, and at the request of the widow, agreed that the widow might select so much and such kind of the estate as she preferred, and keep and use it for her life; and at her death, the whole to be divided equally between the two children, as their absolute property. Under this agreement, she took the largest and best part of the lands, negroes, and other personal property, and held, and enjoyed it unmolested during her life—a period of about 14 years. After her death, on bill filed by the other heirs to enforce this agreement: *Held*—

[1.] That, as to the personal property, the interest conveyed to the children of intestate by this agreement, no remainder, by parol, was created or attempted.

[2.] That the agreement was not within the fifth clause of the 4th section of the statute of frauds, prohibiting agreements in parol that were not to be performed within one year from the making thereof; for the agreement might have been fully executed within the year, and consistently with the intentions of the parties.

[3.] That the agreement, as to the real estate, was taken out of the statute of frauds by performance, etc.

[4.] That the widow, by this agreement, had disposed of her interest in this unadministered estate, and having received full compensation according to, and in terms of the agreement, she and those claiming under her were concluded by it.

Demurrer, decided by Judge RICHARD H. CLARK. In equity, in Decatur Superior Court.    April term, 1864.

William Martin, of Decatur county, died intestate, leaving as his only heirs at law, Nancy his widow, John H. his son, and Sarah his daughter, now Sarah Alderman.    He left also a considerable estate, real and personal, and no creditors.

On the first of May, 1845, some time after his death, the widow and children, at the suggestion of the former, entered into an agreement among themselves, the stipulations of which were, that the widow, in lieu of her interest under the law in the estate of her husband, should select such, and so much of the property, real and personal, as she might desire; and take therein, an estate for her life only, to use and enjoy the same, for that period, with remainder in fee to the two children.    In pursuance of this agreement, she made her selection, taking two tracts of land, several negroes, some horses, hogs, cattle, farming utensils, furniture, etc., the best of each species of property, and such as suited her; and the whole, in point of value, largely exceeding the share or interest the law would have given her in the estate. The property thus selected, she kept, held, and enjoyed, until her death, which took place in January 1859, without molestation or interference from the children or either of them.

In the mean time, however, to wit: on the 10th of March 1847, she intermarried with William Chester.    In contemplation of this event, and six days before it took place, a written contract, under seal, was executed by and between Chester of the one part, and the widow and John H., one of the children, of the other part, by which Chester, in consideration of the contemplated marriage, covenanted and agreed that this property, (describing it, but making no allusion to the source from whence it came, or the mode by which it was acquired,) should be the separate property and estate of the widow, his intended wife, not subject to the payment of his debts, or to be sold or conveyed by him;

20

that the right and title thereof should vest in John H., as trustee, for her use and benefit; and that she might dispose of it by will, to any person she might appoint, subject, however, to be used by Chester during the coverture, and also during his natural life, for the mutual benefit and advantage of her and himself, with the consent and approbation of the trustee. The contract constituted John H. trustee, by the joint nomination and appointment of Chester and the widow, and it declared his acceptance of the trust. It moreover, authorized him, as trustee, to possess himself of, and to control the property in any manner he might deem most advantageous to her, during her natural life.

The object of this contract was, on the part both of Chester and the widow, to protect the interest of John H. and his sister, the children of William Martin, in the property, as fixed by the previous family agreement. Chester knew of that agreement, and of the rights of the children under it, and well understood, at his marriage and before, that the marriage was to confer on him no part of the property— at least, nothing beyond the interest which the widow had in it for her life. And after the marriage, so long as his wife lived, in managing the property, he conformed to the idea that the fee was not his, but belonged to the children.

Sarah, one of the children, although informed before the marriage that a marriage contract would be made, and afterwards, that it had been made, was' also informed that the remainder in the property would be, and was secured by the contract to her and her brother; and she was kept in ignorance of the contrary, mainly by assurances from Chester, himself, that such was the fact. Both the expressions and conduct of Chester, were such, on all occasions, as to induce her to believe that the original family agreement would be carried out in good faith by him, should he survive his wife. But after his wife's death, he refused to deliver up the property, on demand, saying that he had the legal advantage, and was determined to hold it, right or wrong. Sarah then examined into the matter, and, for the

first time, became aware of the true legal effect of the ante-nuptial contract.

She thereupon, in her own right, and as administratrix of her brother, John H., who was dead, filed a bill in equity against Chester, returnable to the October Term, 1861, of Decatur Superior Court, alleging the foregoing facts, and praying for general relief, both in her individual and repre-sentative characters, and particularly that Chester be decreed to deliver up such of the property as she was entitled to in her own right, with its increase, and account for the profits of the same.

The bill was demurred to on three grounds: First, for want of equity; second, because the family agreement set up, was in parol, and, therefore, void; third, because the agreement was a will, and not being in writing and properly executed, was void.

The Court sustained the demurrer on the first ground, and dismissed the bill, and this is the ruling complained of.

Bowers, for the plaintiff in error, sent up his brief.

No appearance for defendant.

Lyon, J.

The only question in this case is, whether the agreement between the complainant and her intestate, John H. Martin, on the one hand, and Nancy, the widow of William Martin, deceased, and now the deceased wife of defendant, as set up in the bill, can be carried into effect without violating any rule of law? The Court below held that it could not, and dismissed the bill filed for that purpose.

The case was submitted to this Court without argument, and if we have failed to meet the theory on which the bill was filed, or that upon which the defence rested, our failure to do so, must be credited to that fact. We have had to de-pend alone on the investigations that we have been able to

give the question, unaided by counsel, or a knowledge of the ground on which the decision of the Court below was placed. We always dislike to be placed in this situation, for the Court cannot always anticipate the views of counsel, or grasp a case in all its bearings until it is looked at from the stand point of counsel or the Court below.

[1.] We are told that the Court below dismissed the bill, because the agreement set up by the bill, was an attempt to create a remainder in personalty by parol, and was void on that account, upon the rulings of this Court in *Kirkpatrick vs. Davidson*, 2 *Kelly*, 301. *Maxwell vs. Harrison*, 8 *Ga.*, 61. *Yarbrough vs. West*, 10 *Ga.*, 471, and *Booth vs. Terrell*, 16 *Ga.*, 20. These cases certainly do establish the rule that a remainder in slaves, personal property, cannot be created by a verbal or parol gift. They go no further; and although this is the law of the land, and must be so regarded, I, speaking for my self only, doubt the soundness of the rule, because I cannot see any good reason for it. The old rule was, that a remainder could not be created in personalty, even by deed or will, but that rule has long ceased to exist, and this rule, which was founded on that rule, or grew out of it, ought to have passed away with it, or to be more accurate, should never have been made. If the estate or interest created in ¦the thing be not obnoxious to the statute of frauds, it should not be declared void simply because it was a remainder. Almost every other species of interest or estate in personalty, that can be created by deed or will, can be by parol, and why not a remainder when not otherwise obnoxious to other rules of law? This doubt of mine, however, has nothing to do with the interpretation we put upon this agreement, either in my own judgment or that of my associate.

The agreement does not make an estate in remainder, and does not, consequently, fall within the rule of the cases cited, because the property about which this difficulty arises —the personal assets of the unadministered and unrepresented estate of William Martin, deceased, did not belong

to the persons making the agreement in respect to its disposition—that is, they did not have the legal title to them ; for personal assets do not descend and belong to the heir at law, but to the administrator, who alone can, at law, sell or dispose of them ; therefore, any agreement that these parties might make in respect to them, could not make an estate in remainder, or otherwise, that would be good at law. Their interest—that of these contracting parties—was not a legal, but an equitable one. Concede, however, that although these parties have not an estate good at law, in this personal estate, and, therefore, could not make a technical remainder on that account, still, in disposing of mere equitable interests, if such an estate should be created, which, at law, would be void for conflict with its rules, such equitable estate, or interest, so created, would also be void for like reasons, which I do not admit, then, we say, that there is no remainder, strictly and technically so-called, created by this agreement, whether considered as a legal estate, or as a mere equitable interest. I shall first dispose of the question as to the personal property; that as to the lands stands on a different footing, and must be tried by other rules.

The fact that this estate, thus created, by this agreement, in the complainants, is called by the parties in the same, and by the pleader in framing the bill, a remainder, does not make it one. The term is employed loosely, and in what Mr. Fearne calls a lax sense.—1 *Fearne, Con. Rem.*, section 159 ; *page* 54.

The personal property in controversy, is the one-third part of William Martin's estate that would have been apportioned to his widow as one of the three heirs at law of the deceased, and belonged to her absolutely, had there been a regular distribution under the statute, and the amount or parts of the shares of the other two heirs, in excess of the one-third of the estate, which she took and the others gave in consideration of her agreement that they might have the whole at her death, whenever that might happen. As to the excess over one-third, or that portion of the estate which

she, under the agreement, took, over and above one-third, and which, but for this agreement, would have been apportioned to and belonged to the complainants, there can be no remainder as to this part of the property, because it equitably belonged to the complainants, and was so treated in that arrangement, and now it returns to those who gave it. This is in the nature of a reversion, certainly not of a remainder; and a reverson by parol gift is not void, or has never been so decided in Georgia.—*Booth vs. Terrell.* 16 *Geo.*, 20 Such disposition of personal property, instead of being held void, is constantly sustained by the Court, as in cases of loans to children, and all other questions of like character. Then, as to the third, or that portion, of the personal property embraced in this agreement, and which equitably belonged to Mrs. Martin, there was no remainder created or attempted, for there was no particular estate carved out of it to support such remainder, and without which none can exist.—2 *Blk. Com.* 165. 2 *Co. Litt.* 126, 49 *a*, where a remainder is defined, most accurately and technically, to be "a residue in an estate in land depending upon a particular estate, and created together with the same." Here the whole estate was disposed of, though the enjoyment was not to commence until after the death of Mrs. Martin. An estate created to commence at a distant period of time, without any intervening estate, is, therefore, properly no remainder; it is the whole of the gift, and not a residuary part. And such future estate can only be made of chattel interests, which were considered in the light of mere contracts, by the ancient law, (*Raymond* 151,) to be executed either now or hereafter, as the contracting parties may agree, (2 *Blk. Com.*, 165,) and that is this case.

[2.] Another reason for the judgment of the Court below, has been assigned, and that is, that the agreement is obnoxious to the fifth clause, fourth section of the statute of frauds, in that the agreement was not to be performed within the space of one year from the making thereof. We do not think that the agreement is obnoxious to that clause, or any

other, of the statute of frauds.   The parties made no stipu-
lation as to time, but the performance of the agreement
depended upon a contingency that might have occurred
within the year, and consistently with the understanding
and rights of the parties.   It is well settled that such agree-
ments are not within the statute of frauds.—*Fenton vs. Em-
blers.    3 Burr.* 1278 ; 1 *Salk,* 280 ; 1 *Lord Raymond,* 316 ;
*Brown on Statute of Frauds,* section 272 to 279, *and cases
there cited.*

[3.] The agreement as to the real estate is taken out of
the statute by part performance.   Giving up the possession,
use, and profits of the land by complainant, and the taking
possession, and use thereof, by Mrs. Martin, during the
whole term of her life, from the first of May, 1845, to some
time in the year 1859, " all being done in pursuance of, and in
contemplation of the contract," and " unequivocally refer-
ring to and resulting from the agreement," must be held
sufficient performance to authorize a Court of equity to
decree a specific performance of the agreement.—*Gilmore
vs. Johnson* ; 14 *Geo.* 683; *Black vs. Black* 15 ; *Geo.* 445.

The questions here argued are of very great importance
and magnitude, requiring much more time and attention
than I have thought proper to bestow on them in this con-
nection.  I have done but little more than to state the prin-
ciples involved, and give the reasons, briefly, why the
objections suggested do not control this agreement, and I
think that I have succeeded.   I was thus brief because I
felt throughout the investigation, that although the argu-
ment presented was conclusive, yet, that it was not the true
ground on which to rest this case.

[4.] Here are three persons having an equal and common
interest in an undivided and unrepresented estate, consisting
of lands and personal property.   Their title does not come to
them by deed or gift, but it is that which the law casts upon
them as the legal distributees of this estate.   They come to-
gether for the purpose of amicably distributing the estate
amongst themselves in such parts and proportions as they

choose to agree upon, as they have a right to do, and as it has been asserted time and time again by the Courts, they will be protected in. Indeed, such family and friendly set· tlement and distribution of estates, without the aid of an administration, by persons of full age, are greatly favored by the Courts, because they save expense, prevent family feuds and dissensions, and put the parties interested speedily in possession and enjoyment of their rights. The widow, feeling that one-third of the estate would not give her such support and maintenance as she desired, or for some other equally good and sufficient reason, proposes to her step-son and daughter, that if they will permit her to take such parts and as much of the real and personal estate as she prefers, and keep and use it for her life-time, that then the whole estate— that which she selects, as well as that which she does not— shall go to them, to be equally divided between them as their absolute property. They accept her proposition and the agreement is concluded. The widow, in persuance of this agreement, takes the best lands, the best negroes, the best stock; and the best, or choice, of every thing, and much the larger part; to all of which complainants, on the faith of the agreement, consent; and she, in further performance of the agreement, for fourteen years retains and enjoys to the fullest extent, this large and undue proportion of the estate, and without let or hindrance by her co-distributees, and solely on the faith of this agreement. Now what objection can there be to the execution of this most equitable and favorable arrangement, at least for the widow? What has the doctrine of remainder, or the statute of frauds and perjuries, to do with the matter? I have shown they do not control it, but if they did, instead of preventing fraud, and being used for the benefit and security of the rights of parties, these important rules of law would be, in such cases as this, mere instruments to cover and protect the grossest of frauds, and to violate and defeat the rights of persons as arranged and agreed upon by themselves, according to their own wishes and in furtherance of what they believed, and no doubt was, the best

interest of all the parties.    But they—these rules of law—in my judgment, not only do not control, but they have nothing whatever to do with the execution or defeat of this agreement.    The title to this property was not cast upon the parties to this agreement by law, on the death of its owner. Certain substantial formalities, such as administration, distribution, apportionment, or partition, were necessary before they, or either, were clothed with a complete title.    Still, they possessed a substantial interest therein, the right to the one-third part thereof by each, through, and by this machinery of the law for transferring the légal title from, and out of, the intestate into them.    The widow, however, desires a different interest or estate than that which the law would give her, and her co-heirs, to oblige and gratify her wishes, or because they preferred a different interest themselves than the law would give them, consent that she may take a different estate—that is, a life estate in a larger and better portion of the estate than one-third, and she takes and enjoys that other and different estate, in lieu of the one which the law gave her.    Is there any rule of law that prohibited her from so doing?    She was *sui juris*, capable of judging what was to her interest and what was not, and having acted, is she not concluded thereby?    We think so, most unquestionably.    She had an interest in an undivided, unrepresented estate, and proposed to sell out that interest to her co-heirs; they accept the proposition, buy her interest, pay her for it; she receives and enjoys the compensation, and now that the whole is done and past, shall her representatives repudiate her agreement?    We think not.    On the contrary, we think that they are absolutely concluded.